IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MELINDA DELORA GOLDSBY, )
 )
  Plaintiff, )
 )
  v. ) CIVIL ACTION NO. 2:12-cv-151-CSC
 ) (WO)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security,[1] )
 )
  Defendant. )

## MEMORANDUM OPINION

### I. Introduction

On April 9, 2009, the plaintiff, Melinda Delora Goldsby, filed a Title II application

for a period of disability and disability benefits and a title XVI application for supplemental

security income. (R. 135-146).   Goldsby alleged a disability beginning on May 30, 2006.

(R. 135-146).   After the claims were initially denied, Goldsby requested and, on July 19,

2010, received a hearing before an administrative law judge ("ALJ").   (R. 9, 65).   Following

the hearing, ALJ Mary E. Helmer denied the claim on September 20, 2010.   (R. 45).   On

December 29, 2011, the Appeals Council rejected a subsequent request for review.   (R. 1).

The ALJ's decision consequently became the final decision of the Commissioner of Social

Security ("Commissioner").[2]   *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).   The

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.

[2]Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No.
103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social
Security matters were transferred to the Commissioner of Social Security.

case is now before the court for review pursuant to 42 U.S.C. §§ 405 (g) and 1383(c)(3).

Pursuant to 28 U.S.C. § 636(c), the parties have consented to entry of final judgment by the

United States Magistrate Judge.  Based on the court's review of the record in this case and

the briefs of the parties, the court concludes that the decision of the Commissioner should

be affirmed.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A) a person is entitled to disability benefits when the

person is unable to

> engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result
> in death or which has lasted or can be expected to last for a continuous period
> of not less than 12 months . . .

To make this determination[3] the Commissioner employs a five-step, sequential

evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1)  Is the claimant presently unemployed?
> (2)  Is the claimant's impairment severe?
> (3)  Does the claimant's impairment meet or equal one of the specific
> impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4)  Is the claimant unable to perform his or her former occupation?
> (5)  Is the claimant unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next
> question, or, on steps three and five, to a finding of disability.  A negative
> answer to any question, other than step three, leads to a determination of "not
> disabled."

---

[3]A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[4]

The standard of review of the Commissioner's decision is a limited one.  This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); 42 U.S.C. § 405(g).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A reviewing court may not look only to those parts of the record which supports the decision of the ALJ, but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III.  The Issues

**A.  Introduction.**  Goldsby was born on February 3, 1980, and was 30 years old at the time of the administrative hearing in this case.  (R. 23, 137).  She has some college education.  (R. 12).  She last worked on May 30, 2006, and she alleges that she stopped

---

[4]*McDaniel v. Bowen,* 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits.  *See Sullivan v. Zebley*, 493 U.S. 521, 525 n.3 (1990). Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g., Sullivan*, 493 U.S. at 525 n.3; *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

working because she could no longer perform the physical requirements of her job as a nurse assistant.  (R. 166).  Her past employment history also includes work as a cashier and fast food cook.  (R. 27).  She alleges that she is disabled due to cardiomyopathy and peripheral edema[5] in her legs.  (R. 15, 24, 166).

**B.     The Findings of the ALJ**

The ALJ found that Goldsby has the following severe impairments: obesity; hypertension; and cardiomyopathy.  (R. 37).  The ALJ stated:

> The claimant did not allege obesity as an impairment. However, the medical evidence reflects that the claimant, who is 5'6" tall, has weighed as much as 206 pounds during the period under consideration. Her body mass index is 33.2, representing upper level, Class I obesity. Although obesity is no longer a Medical Listing, it is well known that individuals with obesity may have problems with the ability to sustain a function over time. Accordingly, Social Security Regulations and Rulings mandate that obesity be considered a "severe" impairment and that it be considered along with other impairment in assessing limitation of functioning (Social Security Ruling 02-1p). Throughout the sequential evaluation, wherever possible, I will give the claimant the benefit of the doubt in the assessment of the effect obesity has upon her ability to perform necessary physical activity within the work environment. [Footnote by ALJ:] In fact, the ultimate finding that the claimant is unable to perform more than a reduced level of light exertional work activity (¶ 5, below) is largely based upon a consideration of the physical effects of the claimant's obesity.

(R. 37-38).

The ALJ concluded that Goldsby did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part

---

[5]The ALJ found that Goldsby did not suffer from an impairment of peripheral edema.  (R. 37; *see also* R. 39-44 (discussing the lack of medical evidence of peripheral edema)).  Goldsby does not challenge this finding on appeal.

404, Subpart P, Appendix 1.  (R. 25).

The ALJ determined that Goldsby

> retains the residual functional capacity to perform light work as defined in 20 CFR 404.1567 and/or 416.967. Specifically, the *full range* of light work involves lifting no more than 20 pounds with frequent lifting or carrying of objects up to 10 pounds, standing or walking up to 6 hours in an 8 hour day, and sitting up to 6 hours in an 8-hour day; with, generally, occasional stooping, some pushing and pulling of arm and/or leg controls, and the gross use of hands to grasp, hold and/or turn objects. I further find, however, that the full range of light work that can be performed by the claimant is reduced by the following functional limitations: exertionally, the claimant is limited to standing or walking no more than 4 hours in an 8-hour day. She is further limited to work which involves no exposure to pulmonary irritants such as fumes, odors, dust, gasses, poorly ventilated areas, etc. She may only rarely operate motor vehicles, climb stairs or ladders, balance, or perform pushing and pulling of arm and/or leg controls. She may occasionally bend, stoop, reach (including overhead), and work with or around hazardous machinery; and may frequently engage in gross (grasping, twisting and handling) and fine (finger dexterity) manipulation.

(R. 38-39).

The ALJ found that Goldsby "is able to return to her past relevant work as a cashier as it is generally performed in the national economy."  (R. 44).  Therefore, the ALJ concluded that Goldsby is not disabled.  (R. 44).

**C.  Goldsby's Claims.**

Goldsby presents the following issues for review:

1.  Whether the ALJ erred in finding that Goldsby's cardiomyopathy does not meet the listing in 20 C.F.R. 404, subpt. P, App. 1 § 4.02; and

2.  Whether the ALJ erred in assigning little weight to an opinion of Goldsby's primary care physician, Dr. Sumana Nagireddy.

(Doc. 12 p. 6).

## IV.  Discussion

**A.    Substantial evidence supports the ALJ's finding that Goldsby's cardiomyopathy does not meet the listing in 20 C.F.R. 404, subpt. P, App. 1 § 4.02.**

Goldsby argues that the ALJ erred by failing to find that she had an impairment that met or equaled the listing for cardiomyopathy found in 20 C.F.R. 404, subpt. P, App. 1 § 4.02.  Goldsby contends that the ALJ relied "solely" on the opinion of a consulting physician, Dr. Anderson, who did not provide a detailed analysis of every individual element of the listing for cardiomyopathy found in 20 C.F.R. 404, subpt. P, App. 1 § 4.02.  (Doc. 12 p. 9). However,  the ALJ did not rely "solely" on Dr. Anderson's opinion, and an ALJ does not need to "mechanically recite the evidence" of every element of a listing.  *Hutchinson v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986).  Where the ALJ's listing determination is not explicitly stated, it may be found implicitly in the ALJ's decision where the ALJ proceeds to steps three and four of the sequential evaluation process.  *Id.*  Accordingly, the court will consider both the explicit and implicit findings of the ALJ with respect to the listing requirements.

 At step three of the sequential evaluation process, the ALJ provided an explanation of her finding that Goldsby did not have an impairment or combination of impairments that met a listing. The ALJ stated:

> The Medical Listings (20 C.F.R. Part 404, Appendix 1, Subpart P) outline the findings – the "criteria" – which must be present for an impairment to be found disabling.  Although  the  undersigned  finds  that  each  of  the  medically

determined impairments referred to in ¶ 3, above, are "severe" in the sense that each may have more than a minimal effect on the claimant's ability to perform basic work activities, no acceptable medical source has concluded that the impairments, either singly or in combination, meet or equal in severity the criteria of a listed impairment. Despite the fact that the claimant has not specifically alleged that any impairment has met or equaled a listing, I have undertaken an independent, detailed examination of the evidence for the purpose of determining whether any relevant medical or mental listing has, in fact, been met. Taking into consideration the credible, objective medical evidence and the claimant's subjective symptomology (to the extent allowed under Social Security Rulings 96-4p and 96-7p) and the effects of her obesity as required under Social Security Ruling 02-1p and Section 1.00(Q) of the listings, I have compared the claimant's impairments with the cardiovascular system listings and find that the severity of her impairments, whether considered individually or in combination, fails to meet the criteria of any of the impairments listed in Appendix 1.

Further support for this conclusion has been derived from the testimony of James M. Anderson, M.D., the impartial medical expert who reviewed the documentary evidence of record and was present during the claimant's testimony at the hearing. Based upon his consideration of the documentary and testimonial evidence, Dr. Anderson testified that the record did not establish an impairment or combination of impairments that met or equaled the criteria of a listed disorder.

(R. 38).

The listing for cardiomyopathy, which the ALJ considered but did not mechanically recite, requires that objective medical evidence (as described in 20 C.F.R. 404, subpt. P, App. 1 § 4.00(D)(2)) must document that, "*while on a regimen of prescribed treatment*," the claimant suffers from chronic heart failure of such severity that the claimant has an "ejection fraction of 30 percent or less" and "[p]ersistent symptoms of heart failure which *very seriously limit* the ability to independently initiate, sustain, or complete activities of daily living." 20 C.F.R. 404, subpt. P, App. 1 § 4.02(A)(1) & (B)(1) (emphasis added). "For a

7

claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  In arguing that the ALJ failed to consider all the requirements of the listing, Goldsby herself does not address "all the specified medical criteria of the listing;" she only argues that testing revealed an ejection fracture of 30 percent or less, and she alleges that she has "persistent symptoms of heart failure that limit her ability to independently intiate, sustain, and complete daily activities." (Doc. 12 p. 7).  The listing, however, requires more.

As Goldsby points out, her treating cardiologist analyzed the results of a March 1, 2010 echocardiogram and concluded that "[t]he calculated left ventricular ejection fraction of 54% is clearly too high. The visually estimated left ventricular ejection fraction would be 25-30% . . . . The ejection fraction of 54% is clearly too high and the estimated ejection fraction is roughly 30-35%." (R. 366).  However, at steps four and five of the sequential evaluation process, the ALJ expressly concluded that the March 1, 2010 echocardiogram did not qualify as medical documentation of chronic heart failure *"while on a prescribed treatment regimen*." 20 C.F.R. 404, subpt. P, App. 1 § 4.02(A)(1) (emphasis added).  As the ALJ explained:

> James N. Anderson, M.D., an impartial medical expert, appeared and testified at the hearing. Dr. Anderson is a thoracic surgeon with more than 40 years experience. He is a Fellow of the American College of Cardiology and was, at one time, the Chief Surgical Resident in Cardiovascular Research, Harvard Medical School (Exhibit 15B). The claimant expressed no objections to Dr. Anderson's qualifications or to his testifying as a medical expert in this case.

Dr. Anderson testified that his review of the medical records disclosed that the claimant's impairments included obesity, hypertension and cardiomyopathy, the latter having been diagnosed in 2000.  He noted that, while the claimant had initially received care for the heart condition for several years,[6] she ceased treatment altogether, only to resume in September of 2009.[7]  Dr. Anderson also noted that the claimant had been recently evaluated by a cardiologist who gave a diagnosis of postpartum cardiomyopathy and that echo cardiogram testing had revealed ejection fractions of 30-35% *without treatment*.[8]  It was Dr. Anderson's opinion that, with her return to treatment, the ejection fraction percentage should be improved. He emphasized that in May of 2010 (2 months prior to the hearing), the claimant's present treating cardiologist had given the claimant a New York Heart Association Classification of Class I which, according to Dr. Anderson, represents no physical restrictions and no significant symptoms. . . .

. . . . Under questioning [by Goldsby's representative], Dr. Anderson also iterated his opinion that, with proper treatment, the ejection fraction level was likely to increase. In that regard, he stated that the reason he had suggested a light level of work activity was because a 30% ejection fraction would normally be representative of a light work capacity to a cardiologist.

(R. 41-42 (emphasis in original)).

Goldsby entirely fails to address the ALJ's conclusion, which is substantially supported by Dr. Anderson's testimony, that "echocardiogram testing had revealed ejection fractions of 30-35% *without treatment*."  (R. 41-42 (emphasis in original)).  Accordingly, Goldsby has not met her burden to demonstrate that she meets the *all* the requirements of the

---

[6]Here, the ALJ inserted the following footnote: "The claimant's non-compliance with medication and treatment during this period is iterated."

[7]Here, the ALJ inserted the following footnote: "The claimant apparently decided to resume care only after the initial denial of her claims, about 2 [weeks] following the date on which she obtained a representative and [filed] her request for a hearing."

[8]Here, the ALJ inserted the following footnote: "The claimant's ejection fraction, at the time of her last "pre-filing" . . . visit [to her cardiologist] in 2005 had been 55% (Exhibit l0F)."

listing for cardiomyopathy. *Sullivan*, 493 U.S. at 530 (holding that, for a claimant "to show that his impairment matches a listing, [the impairment] must meet *all* of the specified medical criteria." ); *see* 20 C.F.R. 404, subpt. P, App. 1 § 4.02 (setting forth the listing for "[c]hronic heart failure *while on a regimen of prescribed treatment, with symptoms and signs described in 4.00D2*" (emphasis added)); 20 C.F.R. 404, subpt. P, App. 1 § 4.00(D)(2) ("What evidence of CHF do we need? a. Cardiomegaly or ventricular dysfunction must be present and demonstrated by appropriate medically acceptable imaging, such as . . . echocardiography.").

Goldsby also argues that she meets the listing because she has "persistent symptoms of heart failure that limit her ability to independently initiate, sustain, and complete daily activities." (Doc. 12 . 7). As medical evidence of symptoms that "limit" her ability to carry out her activities of daily living, Goldsby points to several medical records of events that occurred while she was not on, or not compliant with, her regimen of prescribed treatment. In August, 2000, two months after the birth of her only child, Goldsby was admitted to the hospital and was diagnosed with "new onset congestive heart failure secondary to postpartum cardiomyopathy." (R. 235-238). With treatment, the congestive heart failure was resolved. (R. 268). Again in September 2000, she was treated for congestive heart failure; at that time her treating physician noted: "She has recurrent heart failure. She has been taking her medications, but has not been compliant with watching her weight and diet very carefully. She should improve rapidly." (R. 289-90). These events that occurred in 2000, before the onset of disability in 2006, do not establish "[c]hronic heart failure *while on a regimen of*

10

*prescribed treatment*." 20 C.F.R. 404, subpt. P, App. 1 § 4.02(A)(1) (emphasis added).

The medical evidence of congestive heart failure in 2000 also does not indicate "*[p]ersistent* symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living." 20 C.F.R. 404, subpt. P, App. 1 § 4.02 (B)(1) (emphasis added). "Persistent" as used in the listing "means that the longitudinal clinical record shows that, with few exceptions, the required finding(s) has been present, or is expected to be present, for a continuous period of at least 12 months, such that a pattern of continuing severity is established." 20 C.F.R. 404, subpt. P, App. 1 § 4.00 (A)(3)(b). As the ALJ noted in her opinion:

> Following the resolution of the congestive heart failure [in 2000] and all other symptoms, the claimant was discharged on medication. She was apparently treated by Dr. Moore shortly after the discharge. However, the documents received from his office appear to be incomplete, with the first office visit of record being in September of 2002, following a period of repeated medication and follow-up non-compliance by the claimant (Exhibit 2F). At that time, she was doing well, with no complaints, and she denied leg swelling, chest discomfort, or shortness of breath. Further examination of the [cardiologist's] records preceding the date of the claimant's application for benefits (Exhibits 2F and IOF) reveals that the date of the claimant's last visit "pre-filing" visit was on September 19, 2005. They also reveal a continuing pattern of non-compliance with medication, repeated missed appointments, significant gaps in treatment, and repeated denials of chest pain or shortness of breath/dyspnea.

(R. 40).

Goldsby also points to medical records from February 4 and March 3, 2010, contending that these records also indicate that her cardiomyopathy creates persistent symptoms that very seriously limit her activities of daily living. However, the ALJ

considered these records and concluded otherwise:

> [T]he claimant apparently determined that her condition and symptoms were not serious enough to require treatment or medication during the approximate four-year period preceding the initial denial of her claims for disability benefits. It was only after the denial of her claims, her retention of a representative, and her request for a hearing that the claimant sought additional treatment. She saw her new family medicine provider, Sumana Nagireddy, M.D., for the first time, during a brief office visit on September 23, 2009, two weeks after filing her request for a hearing (Exhibit 7F). More than 4 months passed before she returned to Dr. Nagireddy's office on February 4, 2010. At that time, she voiced multiple complaints that, based on the records, had not been mentioned by her at the time of her first visit. She was referred to MCA, for an echocardiogram, which was performed by cardiologist, David E. Good, M.D., on March 1, 2010 (Exhibit 10F). Based on the results of the echocardiogram and his subsequent unremarkable physical examination (which, as previously noted, included a finding of no lower extremity edema) on May 3, 2010, Dr. Good reached the conclusions noted by Dr. Anderson during his testimony [including assigning Goldsby a New York Heart Association Classification of Class I, which represents no physical restrictions and no significant symptoms].

(R. 41-42).

The ALJ also observed: "The office notes of the claimant's family practitioner, following his examination on February 4, 2010, contain his assessment that the claimant's alleged 'chest pain' looked more like gastroesophageal reflux disease."  (R. 42 n.6; R. 344).

The court has independently reviewed the medical record, and it is consistent with the ALJ's summary and analysis of the medical evidence.  Substantial evidence supports the ALJ's determination that medical records from February and May, 2010, do not indicate "persistent" heart failure symptoms that "very seriously limit" Goldsby's activities of daily living.  20 C.F.R. 404, subpt. P, App. 1 § 4.02 (B)(1).

Goldsby also points to a June 9, 2009, function report in which she stated that she "wake[s] up during the night with chest pains and shortness of breath" and that she tires easily when performing her daily tasks. (R. 102). This subjective self-report is not the sort of medical documentation required to demonstrate persistent symptoms of heart failure that limit daily activities. 20 C.F.R. 404, subpt. P, App. 1 § 4.00 (A)(3)(b) (defining "[p]ersistent" in terms of "that the longitudinal clinical record"); 20 C.F.R. 404, subpt. P, App. 1 § 4.02 (requiring that symptoms and signs of chronic heart failure must be documented by objective medical evidence (as described in 20 C.F.R. 404, subpt. P, App. 1 § 4.00(D)(2)). Further, as the ALJ noted, after 2005, Goldsby did not seek treatment for her heart condition until September 23, 2009. (R. 42). On September 23, 2009, her physician noted that Goldsby "used to take Lasix, Coreg, Spironolactone, and Warfarin before, and she stopped drugs in 2006. After that she did not have any primary cart physician. . . . Current medications: nil." (R. 348). Accordingly, substantial evidence supports the conclusion that Goldsby's June 9, 2009 function report does not establish "persistent" heart failure symptoms that "very seriously limit" Goldsby's activities of daily living "while on a regimen of prescribed treatment." 20 C.F.R. 404, subpt. P, App. 1 § 4.02 (B)(1).

Finally, as evidence that her cardiomyopathy very seriously limits her daily activities, Goldsby points to her own subjective testimony of chest pain and pain and swelling in her legs. "[S]ubjective pain testimony supported by objective medical evidence of a condition that can reasonably be expected to produce the symptoms of which the claimant complains

is sufficient to sustain a finding of disability." *Walker v. Bowen*, 826 F.2d 996, 1003–04 (11th Cir. 1987).   Where there exists objective medical evidence of an impairment which could reasonably be expected to produce the claimant's symptoms, the ALJ must consider the claimant's subjective testimony and, if the ALJ rejects that testimony, the ALJ must articulate explicit and adequate reasons" for doing so.  *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir.1988); *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir.1987).  The ALJ clearly articulated reasons for finding that the medical evidence did not support Goldsby's subjective testimony that her cardiomyopathy caused chest pain and edema that persistently interfered with her daily activities while on a treatment regimen.  (R. 39-44 (noting, *e.g.*, that the medical record indicated gaps in treatment and noncompliance with treatment, repeated denials of chest pain and shortness of breath, treating physicians' observations that Goldsby had no edema, a primary care physician's attribution of chest pain to gastrointestinal reflux disease, the treating cardiologist's finding that Goldsby had no physical restrictions and no significant limitations, and lack of any medical treatment for peripheral edema).  Goldsby has not addressed any of the ALJ's reasons for discounting her subjective testimony, and substantial evidence supports the ALJ's findings.  *See Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) ("A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court.").

Accordingly, substantial evidence supports the ALJ's implicit and explicit conclusions that Goldsby did not meet the requirements of the listing because she did not exhibit "chronic

14

heart failure while on a regimen of prescribed treatment" resulting in (1) an ejection fracture of 30 percent or less during a period of stability and (2) "[p]ersistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living." 20 C.F.R. 404, subpt. P, App. 1 § 4.02(A)(1) & (B)(1) (emphasis added); *see Sullivan v. Zebley*, 493 U.S. at 530 (holding that, for an impairment to meet or medically equal a listing, the impairment "meet *all* of the specified medical criteria.").

**B.     The ALJ did not err at step three of the sequential evaluation process by rejecting some of the findings of Goldsby's treating primary care physician.**

On April 19, 2010, Goldsby's treating primary care physician, Dr. Sumana Nagireddy, filled out a physical capacities evaluation form. (R. 350).  With two exceptions, the residual functional capacity determination of the ALJ is consistent with Dr. Nagireddy's evaluation. First, Dr. Nagireddy indicated that Goldsby could sit for eight hours during an eight-hour work day, but the ALJ determined that Goldsby was further limited to sitting for up to six hours in an eight-hour work day. (R. 38; 350).  Second, the ALJ rejected Dr. Nagireddy's opinion that Goldsby was likely to be absent from work four days per month. Dr. Nagireddy's brief explanation for this limitation was that Goldsby "has congestive heart failure with ejection fracture of 30-35% which may be affecting her daily activities." (R. 350).  According to the undisputed testimony of an impartial vocational expert, if Goldsby missed four work days per month due to her congestive heart failure, Goldsby's ability to perform any jobs available in the national economy "would be eliminated." (R. 28).

As the ALJ noted, "[a]lthough Dr. Nagireddy had only seen [Goldsby] on two

occasions during the 8-month period preceding his responses to the [physical capacity] questionnaire, he meets the definition of a 'treating medical source'" pursuant to 20 CPR 404.1527(c)(2).  Therefore, to the extent that Dr. Nagireddy's response to the physical capacity evaluation qualifies as a medical opinion,[9] that opinion must be given substantial weight unless the ALJ showed "good cause" to the contrary. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004).  "'Good cause' exists when the (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id*.  When the ALJ disregards the opinion of a treating physician, the ALJ must clearly articulate her reasons for doing so.  *Id*.

Substantial evidence supports the ALJ's clearly articulated reasons for rejecting Dr. Nagireddy's conclusion that Goldsby's congestive heart failure would cause her to miss four days of work per month.  First, as Goldsby fails to mention, this case involves the competing opinions of *two* treating physicians.  The opinion of Dr. Nagireddy, a primary care physician, conflicts with the slightly more recent opinion of the treating cardiologist, Dr. Good.  Dr. Good concluded that Goldsby "is New York Heart Association Class I," which, as both the ALJ and Dr. Anderson pointed out, is equivalent to a finding that Goldsby had cardiac

---

[9]*But see* 20 C.F.R. § 404.1527(d)(2)-(3) ("Opinions on some issues . . . are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.*, that would direct the determination or decision of disability. . . . Although we consider opinions from medical sources on issues such as . . . your residual functional capacity. . . the final responsibility for deciding these issues is reserved to the Commissioner. We will not give any special significance to the source of an opinion on issues reserved to the Commissioner.").

disease with no resulting limitation of physical activity.  (R. 43 & n.7; R. 359-61).  The opinion of a specialist is generally due more weight than that of a general practitioner.  *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

Further, as the ALJ noted, "Dr. Nagireddy's opinion that the claimant would likely be absent from work four days per month as a result of her impairment or treatment [is] inconsistent with his own opinions relating to the claimant's functional capacity for an 8-hour workday." (R. 43).  Moreover, in explanation of his opinion, Dr. Nagireddy's provided only a brief note that Goldsby "has congestive heart failure with ejection fracture of 30-35% which may be affecting her daily activities."  (R. 350).  *See Phillips*, 357 F.3d at 1240 (holding that and ALJ has good cause to reject a treating physician's opinion when the "treating physician's opinion was conclusory or inconsistent with the doctor's own medical records").  By way of contrast, Dr. Good's opinion, which also took into consideration Goldsby's ejection fracture of 30-35%, was supported by a three-page new patient evaluation report that supported his conclusion that Goldsby had no physical limitations associated with her heart condition, and that did not support a finding that Goldsby would miss four work days per month due to symptoms of cardiomyopathy.[10]  The ALJ did not err in giving more

---

[10]In his May 3, 2010 report, Dr. Good noted:

[A]pparently ten years ago, two months after the birth of her daughter, [Goldsby] was noted to have excessive swelling and shortness of breath. *She had one episode of syncope and at that time she was begun on medical therapy for cardiomyopathy which apparently resolved*

weight to the well-supported opinion of the treating physician than to the conclusory opinion of the general practitioner.  *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.").

The ALJ's decision to credit the opinion of the treating cardiologist is further substantially supported by the testimony of Dr. Anderson, the consulting physician, who also gave more weight to the opinion of the treating specialist. Dr. Anderson testified in detail as to why the opinion of the treating cardiologist, as well the medical record as a whole,

---

*relatively quickly.* At some point her Coreg has been discontinued but Ms. Goldsby is uncertain as to why this was done. *Presently, she does not exercise, however, she is able to walk basically "as far as she wants to." She has no other particular problems or complaints.*

. . . .

ASSESSMENT AND PLAN:

1.0 Significantly decreased left ventricular ejection fraction of 30-35% in a 30 year old lady with a history of postpartum cardiomyopathy in the remote past as well as hypertension.

I am uncertain as to why her Coreg was discontinued in the past, but she clearly has worsened at least her LV function since this was done. We will titrate her Coreg back to 25 twice a day following her symptoms as well as her heart rate and will check a 2-D echo within three months to determine her need for primary prevention, AICD. She has been on 40 mg of Lisinopril and is tolerating this well.

*She has not had any syncope, presyncope or palpitations that would be concerning for ventricular arrhythmias at this time and adequate medical therapy is indicated.*

2.0 She is New York Heart Association Class I, so Aldactone is presently not indicated.

(R. 359-61 (emphasis added)).

18

supported a finding that Goldsby had no physical restrictions and did not support a finding that Goldsby would miss four or more days of work per month.  (R. 23-27).  Dr. Nagireddy's comparatively brief explanation that Goldsby "has congestive heart failure with ejection fracture of 30-35% which *may be* affecting her daily activities" (R. 350 (emphasis added)) is equivocal at best, and is not supported by the medical record as a whole.  The ALJ's reliance on Dr. Anderson's testimony, which Dr. Anderson supported with detailed explanations based on the medical record, is supported by substantial evidence and free of legal error.  *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, . . . [and t]he better an explanation a source provides for an opinion, the more weight we will give that opinion. . . . [B]ecause nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources."); 20 C.F.R. § 404.1527(c)(3) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

In rejecting Dr. Nagireddy's opinion regarding Goldsby's ability to maintain work attendance, the ALJ also "iterated that, prior to the denial of her claim for benefits, the claimant's impairments had not required physician treatment even once during a period of almost five years. Following the denial of the claim, she sought treatment on only four

occasions during a 12-month period." (R. 43-44). Goldsby's lengthy failure to continue medical treatment further supports the ALJ's decision. *See Ellison v. Barnhart*, 355 F.3d 1272, 1275 (holding that "'refusal to follow prescribed medical treatment without a good reason will preclude a finding of disability'" (quoting *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir.1988)); *see also* 20 C.F.R. § 404.1527(b) ("How we consider medical opinions. In determining whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."); *see also Phillips*, 357 F.3d at 1240 (holding that an ALJ has good cause to reject a treating physician's opinion that is not bolstered by the evidence).

Accordingly, the ALJ's decision not to accord controlling weight to Dr. Nagireddy's opinion about Goldsby's ability to maintain attendance at work, and the ALJ's decision to instead accord controlling weight to the opinion of the treating cardiologist, are supported by substantial evidence and are fully in accordance with the controlling law and regulations.

## V. Conclusion

For the reasons as stated, the court concludes that the decision of the Commissioner denying benefits to Goldsby should be affirmed. *See Landry v. Heckler*, 782 F.2d 1551, 1551-52 (11th Cir. 1986) ("Because the factual findings made by the [ALJ] . . . are supported by substantial evidence in the record and because these findings do not entitle [the claimant] to disability benefits under the appropriate legal standard, we affirm.").

20

The Court will enter a separate final judgment.

Done this 11th day of June, 2013.


　　　　　　　　　　　　/s/Charles S. Coody
　　　　　　　　　　CHARLES S. COODY
　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE